**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CATHRYN COLEMAN, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | **09 CV 739** |
| v. | ) | |
| | ) | |
| COOK COUNTY, | ) | **Honorable David H. Coar** |
| | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM OPINION AND ORDER**

Before this Court is a Motion for Summary Judgment filed by Defendant Cook County against Plaintiff Cathryn Coleman. Cook County seeks summary judgment in its favor on Coleman's failure to accommodate and retaliation claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED on all claims regarding requests for reasonable accommodation denied prior to July 8, 2004 and DENIED as to all other claims.

**FACTS**

Plaintiff Cathryn Coleman began working for Cook County Hospital, Fantus Clinic, on May 21, 1990. (Def. Statement of Facts ("SOF") ¶ 5). She assumed the position of Clerk V in or

1

around the year 2000 and resigned in or about October 2007. (Pl. SOF ¶ 2.) The duties of a Clerk V in Registration include greeting people, obtaining registration information, electronically entering and verifying patient information, checking patients out, scheduling follow-ups, creating document packets, answering calls, and generating reports, among other responsibilities. (Pl. SOF ¶ 4.)

Coleman began suffering intermittent problems with her voice in 1998. (Def. SOF ¶ 14.) In February of 2002, Coleman visited a health clinic for cursory evaluation of her harsh, strident, and low volume voice. (*Id.*) She was seen by Matt Wendell, who attributed her condition to "probable acute strain, severe infection and subsequent vocal abuse," recommending a period of total voice rest before voice therapy. (*Id.*)

On January 31, 2003, Dr. Lawrence Okafor completed a *Request for Medical Data* form, stating that Coleman was disabled from January 15, 2003 to February 3, 2003. (Def. SOF ¶ 17.) He provided a "Restricted Release" note, restricting Coleman to work environments not exposed to "extremes of heat, cold or humidity." (*Id.*) Dr. Okafor instructed that Coleman should "avoid cold air blowing on her all day" and "minimize talking until she fully recovers her voice." (*Id.*)

Coleman filed an initial claim of discrimination with the Illinois Department of Human Resources ("IDHR") and Equal Employment Opportunity Commission ("EEOC") on May 4, 2005, alleging that she had been denied these accommodations in January 2003, among others throughout the intervening two years. (Pl. SOF ¶ 21.) Coleman did not file a claim for discrimination until May 2005 because she thought that her supervisor, Lillian Scruggs, would eventually accommodate her, being herself a disabled individual. (Pl. SOF ¶ 22.)

On February 25, 2003, Dr. Okafor issued an *Attending Physician's Statement of Disability* form and indicated that plaintiff was disabled. (*Id.*) In response to the form question

2

"When will the patient be able to return to Regular Occupation," Dr. Okafor wrote "indefinite." (*Id.*) Dr. Okafor would continue to postpone Coleman's return-to-work date, stating as his reason that she was receiving speech therapy, until June 1, 2005. (Def. SOF ¶ 18.) In December 2004, Plaintiff was diagnosed by Dr. Benjamin Gruber with Spasmodic Dysphonia, a neuromuscular disorder of the larynx, which affected her ability to speak. (Def. SOF ¶ 15.)

Coleman filed her second claim of discrimination with the IDHR and EEOC on July 18, 2005. She alleged that the County, citing a lack of positions available that could accommodate her medical restrictions, had prevented her from returning to work on March 14, 2005, even when a number of appropriate positions allegedly existed. (Pl. SOF ¶ 23.)

On April 29, 2005, Coleman visited Dr. Elam, who performed a hysterectomy for fibroids on May 20, 2005. (Def. SOF ¶ 19.) Dr. Elam required Coleman to remain off work through August 1, 2005. (*Id.*) At follow-up appointments, Dr. Elam successively pushed back this date until Coleman was cleared to return to work, with restrictions, on March 28, 2006. (*Id.*)

Coleman returned to work in June 2006, after Tom Jablonski of Human Relations accepted her restrictions. (Def. SOF ¶ 29; Pl. SOF ¶ 27.)[1] Coleman was reassigned as Clerk V to the Specialty Care Center. (Pl. SOF ¶ 28-29.) She worked on a project specifically created for her, wherein she confirmed insurance verification information on the Medifax system, an outpatient registration data collection program. (Def. SOF ¶ 29, 30.) The position did not require Coleman to speak to patients; instead, she identified, aggregated, and reconciled potential insurance coverages for patients. (*Id.*; Def. SOF ¶ 32, 36.) The project allowed Coleman to return under special funding, as a temporary employee related to the Medifax contract. (Def.

---

[1] The parties' admissions provide conflicting dates for Coleman's return to work. Paragraph 29 of the County's statements of fact indicates that she returned in March 2006, whereas Paragraph 27 of Coleman's statement of facts identifies the date as June 2006. Both statements are admitted by the parties.

3

SOF ¶ 33.) The arrangement was to continue to the extent that budget funds were available or approved. (*Id.*)

On May 31, 2007, the Medifax contract expired, and Coleman could no longer access Medifax's verification system to fulfill her duties under the special project. (Def. SOF ¶ 34; Def. SOF ¶ 37.) Uncertain whether the County would renew the contract or hire another vendor, Coleman worked on the Internet until departing for medical leave in July 2007. (Def. SOF ¶ 37.) She did not return to her specially funded position. (Def. SOF ¶ 34, 38.)

Coleman returned from leave in September 2007 with medical restrictions, including "avoid prolonged talking; avoid extreme temperatures." ((Def. SOF ¶ 20; Def. SOF ¶ 21; Def. SOF ¶ 38.) Her supervisor, Scruggs, did not permit Coleman to return to work as a Clerk V with these restrictions. (*Id.*) Scruggs testified that, in her estimation, the position of Clerk V required "constant talking all day long." (Scruggs Dep. 126:2-21.) Coleman reported to Employee Health Services ("EHS") with the same medical restrictions on October 3, 2007. (Def. SOF ¶ 21.) Her restrictions were, again, not accepted. (*Id.*) Plaintiff filed a claim of retaliation for filing the previous charges on September 21, 2007. (Pl. SOF ¶ 24.)

Coleman resigned on October 22, 2007. On December 20, 2007, Coleman filed a final claim of discrimination and retaliation with the IDHR and EEOC. In her complaint, she alleged that, due to the elimination of her position and statements by her employer indicating that "there was no place for [her] to work within [the County's] environment," she had been subjected to a hostile work environment and compelled to resign. (Pl. Ex. J-3.)

4

**LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

5

**ANALYSIS**

**I. Statute of Limitations**

The County argues that Coleman's claims are barred by the statute of limitations. Under the ADA, a plaintiff must file an EEOC charge within 300 days of the discriminatory act about which she complains, so long as she has initially instituted proceedings with a state or local agency, here the IDHR. 42 U.S.C. § 12117(a) (providing that the complaint procedures under Title VII, set forth in 42 U.S.C. § 2000e-5, apply to complaints under the ADA).

Coleman's first EEOC charge was filed on May 4, 2005. Injuries occurring before July 8, 2004 are therefore not covered by Coleman's first or subsequent claims.[2] Yet, Coleman seeks to recover for denied requests for reasonable accommodation as far back as January 2003, more than 800 days before her first filing date. Coleman's answers to the County's interrogatories indicate that she was denied requests for accommodation on the following dates: January 2003, December 2004, May 2005 (actually the date of an IDHR claim complaining of a request made in March 2005), and July 2005 (another IDHR claim complaining of the March 2005 request).[3]

Coleman relies on the "continuing violation" doctrine to preserve all claims related to events occurring before the 300-day limitations period. Specifically, she argues that the unlawful character of her denied requests did not become clear until some unspecified time after

---

[2] As Coleman's retaliation claim was timely filed, only her failure to accommodate claims are affected by the statute of limitations. Coleman's second claim of discrimination, filed on July 18, 2005, complained of alleged acts occurring relatively recently on March 14, 2005. Plaintiff filed a subsequent claim of retaliation on September 21, 2007, complaining of alleged events occurring two months earlier, on July 20 and 23, 2007. Finally, on December 20, 2007, Coleman filed a claim of discrimination and retaliation on the basis of alleged events occurring on August 9 and September 27, 2007. All of these complaints were filed on the basis of incidents allegedly accruing well within the 300-day period.

[3] Coleman also lists requests for accommodation made in December 2005, January 2006, and March 2006. Because none of these are the subject of IDHR or EEOC charges, the Court cannot consider them. *See Conner v. Illinois Dept. of Natural Resources*, 413 F.3d 675, 680 (7th Cir.2005) (district court correctly excluded evidence relating to the plaintiff's failure to receive a promotion after the filing of EEOC charges because it "was necessarily outside the scope of the EEOC charges").

6

the commencement of the 300-day limitations period. *See Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997) ("A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period."). In the Seventh Circuit, analysis of the continuing violation doctrine under the ADA is the same as the analysis of the doctrine under Title VII. *See Stepney v. Naperville School Dist. 203,* 392 F.3d 236, 239-41 (7th Cir. 2004) (applying Title VII continuing violation precedent to an ADA claim).

Coleman mischaracterizes the continuing violation doctrine and the nature of her injury. She first explains that she could not have brought suit before July 2004 because she "really thought that Ms. Scruggs would be reasonable enough and allow [her] to return back to work . . . and was trying to make allowances for her to reconsider that, especially since she herself is a person with a disability." (Pl. Dep. 239:23-40:5; Pl. SOF ¶ 22.) The Seventh Circuit addressed a similar argument in *Stepney v. Naperville School District*, 392 F.3d at 240. In *Stepney*, the appellant asserted that he could not have acted upon his alleged ADA violation 'until he was personally convinced that the District would not take remedial action to resolve those illegalities." *Id*. In rejecting that proposition, the Seventh Circuit concluded that the 300-day limitations period begins to run "when the employee knows he has been injured, not when he determines that the injury was unlawful." *Id.* (internal quotations marks and citations omitted).[4]

The continuing violation doctrine only applies to cases wherein "duration and repetition

---

[4] For this reason, Coleman's reliance on *Arnold v. Janssen Pharmaceuticals*, 215 F.Supp.2d 951, 960 (N.D. Ill. 2002) is misplaced. In *Arnold*, the plaintiff's request for accommodation was not outright rejected, as here. Because the employer agreed to accommodate the plaintiff's disability, its transitional failures to accommodate on a number of minor occasions may have seemed reasonable at first. Under these circumstances, the court speculated that the plaintiff might have needed some time to realize that her employer was deceiving her. *See id.* In such a scenario, the filing period may begin to run at a later time only because the plaintiff does not "know she is injured" until the cumulative effect of minor breaches of the employer's promises becomes clear.

7

are necessary to convert merely offensive behavior into an actionable change in the plaintiff's working conditions." *Stepney*, 392 F.3d at 240 (citations omitted). "Discrete" events, however repetitive or related, are "actionable standing alone" and "cannot be rendered timely by application of the continuing violation doctrine." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004); *see also Lewis v. City of Chicago*, 528 F.3d 488, 493 (7th Cir. 2008) (noting that that the continuing violation doctrine, "[d]espite its name . . . is a doctrine about cumulative rather than continuing violation"). The actionable character of Coleman's denied request for accommodation was immediately apparent in January 2003; it did not change through duration or repetition. It therefore qualifies as a "discrete" act triggering the limitations period. *See West v. Illinois State Bd. of Educ.*, No. 07 C 2994, 2007 WL 4162814, at *4 (N.D. Ill. Nov. 20 2007) (holding that the continuing violation doctrine does not toll the filing deadline when plaintiff knew of refusals to accommodate before the statute of limitations had run); *Alek v. University of Chicago Hospitals*, No. 99 C 7421, 2002 WL 1332000, at *3 (N.D.Ill. June 17, 2002), *aff'd by unpublished order,* 54 Fed. Appx. 224, 2002 WL 31834017 (7th Cir. Dec.16, 2002) (holding that an allegation of a failure to accommodate is a discrete claim that can only be raised if it accrued within the 300-day limitation period); *Spears v. Delphi Automotive Systems Corp.*, No. IP 00-1653-C-T/K, 2002 WL 1880756, at *15 (S.D. Ind. Aug. 15, 2002) ("[T]he adverse employment action of which [plaintiff] complains is easily identifiable like a discrete act of discrimination since it is a failure to accommodate.").

In order to transform her initial request into a component of a continuing violation, Coleman seeks to submit letters from the County's Employee Health Services showing that she renewed her requests for accommodation every few months from 2003 to 2005, only to be denied each time. These documents are unauthenticated and therefore inadmissible.

8

"Supporting materials designed to establish issues of fact in a summary judgment proceeding must be established through one of the vehicles designed to ensure reliability and veracity – depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.*" Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir.1987) (internal quotation marks and citation omitted).

Even if the Court were to accept the letters, they would do little to advance Coleman's argument. Denied requests for accommodation do not make prior denials of the same request any less discrete or actionable. *See Mendez v. City of Chicago*, No. 03 C 8182, 2004 WL 2980598 at *4 (N.D.Ill. December 22, 2004) ("[D]enial of a repeat request for previously denied accommodations does not constitute a new discriminatory act or make the previous denial part of a continuing violation"); *cf. Kennedy v. Chem. Waste Mgmt., Inc.,* 79 F.3d 49, 50-51 (7th Cir. 1996) (rejecting the "ploy" of later reapplying for a job from which a plaintiff claims to have been unlawfully fired to extend the statute of limitations, when reapplication is not invited).

Accordingly, any of Coleman's claims arising from repeated denials of requests submitted before July 8, 2004 are barred by the statute of limitations. However, the Court is hampered in the analysis of Coleman's accommodation requests by the vagueness of the evidence. While the interrogatories list a number of dates upon which Coleman made requests, she does not reveal the specific accommodations requested on each date. From the language of her discrimination charge, it is possible that Coleman's March 2005 request was different in nature from her 2003 request, in that she appears to have sought a transfer to a Clerk V position in a department more accommodating to her restrictions, as opposed to merely minimizing speaking duties within her present placement. Her December 2004 request, meanwhile, seems to

9

relate to a half-day work arrangement. (Def. SOF ¶ 39.) To the extent that any of Coleman's claims rely on substantively new requests for accommodation arising after July 8, 2004, then, those claims survive.

## II. ADA Claims

The County also argues that Coleman has not established a prima facie case for her claims under the ADA. The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir.2009). To make out a claim under the ADA, an individual must show: 1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation. *Winsley v. Cook County*, 563 F.3d 598, 603 (7th Cir. 2009) (quotations and internal citations omitted).

### A. Disability

The Court begins by examining whether Coleman has provided sufficient evidence to create a genuine issue of fact as to whether she is disabled within the meaning of the ADA. The ADA defines "disability" as either (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1) (quotation marks omitted).

The "substantially limits" clause describes an inability to perform a major life activity, or

a significant restriction as to the condition, manner, or duration under which the average person can perform the same major life activity. 29 C.F.R. § 1630.2(j)(l)(i)-(ii); *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007). Coleman's spasmodic dysphonia meets this bar, as she is significantly prevented from performing such major life activities as speaking and communicating to the extent that an average individual can. (Pl. Dep. 255:15-256:24; Pl. Resp. to Def. Req. to Admit, Ex. 10; Def. SOF ¶ 17, 38, 48); *see also* 42 U.S.C. § 12102(2)(A).

The County urges the Court to follow *Hooper v. Saint Rose Parish*, 205 F.Supp.2d 926 (N.D. Ill. 2002), in which a plaintiff with spasmodic dysphonia failed to qualify as disabled. The *Hooper* court came to its conclusion on the basis of deposition testimony from the plaintiff's doctors, husband, and herself, which revealed that she could speak, albeit softly, but loudly enough to be heard by others. *Id.* at 929. In addition, the plaintiff had declined to take Botulinum toxin ("Botox") injections, despite the fact that they had alleviated her symptoms in the past. The *Hooper* court decided that it could not "permit Ms. Hooper to create a physical disability by failing to pursue treatment options." *Id.* Finally, the court found that the plaintiff failed to demonstrate that her employer perceived her as having a substantial limitation in the life activity of talking. *Id.*

The factual findings of the *Hooper* court do not apply to the instant case. For one thing, the severity of Coleman's spasmodic dysphonia arguably differs from Hooper's. Assessment of a disability involves "the nature and severity of the impairment." 29 C.F.R. § 1630.2(j)(2)(i)-(iii); *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 451 (7th Cir. 2001). Coleman testified that sometimes people have trouble understanding her; they misconstrue her statements or ask her to repeat herself. (Pl. Dep. 256:5-24.) While she can speak to some extent with no problems, her voice will be "completely gone" for a couple of days if exposed to triggers like cigarette smoke. (Pl.

11

Dep. 259:6-16). The County argues that this proves that Coleman's condition is "temporary" and therefore not protected by the ADA. *See* 29 C.F.R. § 1630.2(j). Although the ADA does not cover temporary impairments like broken bones, "an intermittent impairment that is a characteristic manifestation of an admitted disability is . . . a part of the underlying disability and hence a condition that the employer must reasonably accommodate." *Vande Zande v. State of Wisconsin Dept. of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995). There is enough evidence on record to convince a fact-finder that Coleman's intermittent voice loss is a symptom of a disabling neuromuscular disorder. (Pl. Resp. to Def. Req. to Admit, Ex. 10.)

Additionally, Coleman's doctor had not prescribed Botox in her case. (Pl. Dep. 261:14-16.) Although Coleman did not proactively pursue the treatment, nor did she reject medication as Hooper had. (Pl. Dep. 261:19-23; Def. SOF ¶ 15-16.) Rather, Coleman pursued months of speech therapy as medically recommended. (Pl. Dep. 260:24-262:7; Pl. Dep. Ex. 10-18.) Coleman's physician opined that, while Botox injections can be extremely effective in treating the disorder, it does not help all patients. (Pl. Resp. to Def. Req. to Admit, Ex. 10.)

Even if Coleman's condition did not qualify as a disability, whether the County regarded Coleman as being substantially limited in a major life activity remains a genuine issue. Coleman's supervisor explicitly testified that she believed "[Coleman's] disability restricted her from being able to do [her job]" because "she could not talk." (Scruggs Dep. 20:18-22; 30:13.) From the evidence on record, a reasonable fact-finder could conclude that Coleman either had a disability, or was regarded as being disabled, within the meaning of the ADA.

### B. Ability to Perform the Essential Functions of the Job

The Court next turns to whether Coleman is qualified to perform the essential functions

12

of her job, with or without reasonable accommodations. A number of factors affect whether a job function is essential, including the employer's judgment, written job descriptions, the amount of time spent on the function, the consequences of not requiring the function, and the work experiences of those performing the job. *See Basith v. Cook County,* 241 F.3d 919, 927 (7th Cir. 2001).

According to the position's job description, a Clerk V's duties include greeting people, obtaining registration information, electronically entering and verifying patient information, checking patients out, scheduling follow-ups, creating document packets, answering calls, generating reports, among other responsibilities. (Pl. SOF ¶ 4.) Coleman's supervisor testified that the Clerk V position in the Ambulatory Health Care Network required "quite a bit of talking by persons face to face with the patient, on the telephone with providers, different – people come up having been sent here . . . It's constant talking all day long. It's talking and talking." (Scruggs Dep. 126:4-16.) Clearly, talking is an essential and primary function of the position of Clerk V, although non-speaking duties also exist. Unfortunately, talking is an activity that Coleman cannot perform to the extent required.

When a disabled employee cannot perform the essential functions of a job, she must establish that reasonable accommodations exist that permit her to perform those functions. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 865-66 (7th Cir.2005); 42 U.S.C. § 12112(b)(5)(A). Coleman emphasizes that her condition does not completely prevent her from speaking, it merely reduces the time during which she can use her voice each day. Coleman further argues that Clerk V duties vary depending on the department in which the Clerk serves, such that some clerks assume duties particular to a certain unit that are unlisted in the general job description. (Scruggs Dep. 101:2-17.) She also maintains that a Clerk V's responsibilities are

13

subject to special modifications like the ones implemented when Coleman was reassigned to the Specialty Care Center in 2006, a position she fulfilled with no problems. Coleman suggests that she could perform her duties as Clerk V satisfactorily if she could be permitted to assume her speaking duties for half the day and assume alternative duties for the remainder of the day.

The ADA states that "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). Coleman's suggested accommodation for a modified work schedule or job restructuring appears in this list.

Granted, if an accommodation "would impose an undue hardship" on the employer, it need not make the accommodation. 42 U.S.C. § 12112(b)(5)(A). But the issue of "whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee,* 300 F.3d 775, 784 (7th Cir. 2002). The Court acknowledges that Coleman's requests for split days may very well require undue hardship on the County's part, such that it may not be liable for any wrongdoing in denying them. Still, absent sufficient evidence proving that "the costs [of the accommodation] are excessive in relation either to the benefits of the accommodation or to the employer's financial survival or health[,]" the Court is unable to conclude as a matter of law that such is the case. *Id.* As such, Coleman has presented adequate evidence to create a genuine issue of material fact regarding the second element of her prima facie case.

**C. Failure to Make a Reasonable Accommodation or Adverse Employment Action**

Finally, the Court considers whether the County failed to make a reasonable accommodation or took an adverse employment action against Coleman because of her disability. While the parties quibble over the semantics, it is clear from the record that the County declined Coleman's requests for reduced working hours or modified duties. At some point, the Director of Human Resources and Human Resource Analysts "looked around" for another place for Coleman to work as a clerk, but could not locate one. (Def. SOF ¶ 43.) The County offers no evidence detailing what this effort entailed. Coleman's placement within the Specialty Care Center admirably accommodated her restrictions, but only temporarily; the practicality of other such projects is unknown. Given the state of the record, whether or not the provided accommodations were reasonable in light of the County's financial and logistical limitations is not a question the Court can decide as a matter of law at this stage.[5]

Because the existence of an adverse employment action is a more complicated issue, the Court finds it useful to address the topic in the context of Coleman's retaliation claim. On September 21, 2007, Coleman filed a claim with the IDHR, alleging that her supervisor, Scruggs, had harassed her in retaliation for the discrimination charges she filed in May and July 2005. Coleman has elected to prove her retaliation case under the direct method by demonstrating (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) a causal connection between the two. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007).

Coleman's May and July 2005 filings constitute a statutorily protected activity. *See*

---

[5] To prevail on a failure to accommodate claim, Coleman must show: "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008). The County does not dispute that it was aware of Coleman's condition. (Pl. Resp. to Def. Req. to Admit, Ex. 10.) A genuine issue of fact thus exists as to whether Coleman has established a prima facie case for a failure to accommodate claim.

*Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). Scruggs' harassment, however, does not qualify as an adverse employment action. Scruggs allegedly yelled at Coleman, accused her of trying to have another employee to testify against Scruggs, and ignored her when she had an important, work-related question. (Def. Ex. 8 at 15-16.) Such behavior does not represent a "materially adverse change in the terms and conditions of [Coleman's] employment." *See Hopkins v. Godfather's Pizza, Inc.*, 141 Fed.Appx. 473, 476 (7th Cir. 2005) ") (citing *Cerros v. Steel Techs., Inc*., 288 F.3d 1040, 1044 (7th Cir. 2002)).

Coleman has since redesigned her argument. She now claims that Scruggs' refusal to permit Coleman to return to work in September 2007 constitutes the adverse employment action at issue, which eventually compelled her to resign. Coleman's original EEOC charge fails to mention Scruggs' refusal, likely because Scruggs did not formally reject Coleman's restrictions until September 24, three days after Coleman filed her retaliation claim on September 21, 2007. (Pl. SOF ¶ 40; Scruggs Dep. Ex. 4; Pl. Dep. Ex. 30.) A plaintiff may sue for a retaliatory act occurring after the filing of an EEOC charge only if the underlying events are reasonably related to the charges in the EEOC complaint. *See Lloyd*, 552 F.3d at 602.[6] In *Lloyd*, the Seventh Circuit found that a suspension occurring after the plaintiff filed his retaliation charge was not reasonably related to the claim because "the discipline was imposed for additional infractions that occurred later and were thus unforeseeable to [the employer]." *Id.* Since enduring the alleged harassment, Coleman committed no intervening or unforeseeable infractions that contributed to Scruggs' refusal to accept Coleman's restrictions. As an alleged continuation of Scruggs' earlier harassment, supposedly in retaliation for bringing the 2005 EEOC charges, the

---

[6] Coleman has apparently waived her second retaliation claim, filed in December 2007. It accused James Dyson, her Labor Relations Manager, of eliminating funding for her special position in retaliation for a discrimination charge filed on August 9, 2007. The record contains no evidence of any charge filed on that date, and thus no statutorily protected activity. Nor do Coleman's briefs or admissions mention this claim.

16

rejection "describe[s] the same conduct and implicate[s] the same individuals." *Cheek v. W & S Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). The rejection is therefore reasonably related to Coleman's retaliation claim.

Moreover, being prevented from working constitutes an adverse employment action. Because Coleman received reduced pay while on enforced leave, it materially altered the conditions of her employment. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) ("Typically, adverse employment actions are economic injuries such as dismissal, suspension, failure to promote, or diminution in pay.").

The Court must now consider whether Coleman presented sufficient evidence to convince a fact-finder that a causal link exists between her statutorily protected conduct and the retaliatory act. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720-21 (7th Cir. 2005). To begin, the two-year gap between the filed charges and the alleged retaliation is far too long to establish a causal link on temporal proximity alone. *See E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (affirming award of summary judgment for the defendant in part because a six-week gap between filing of EEOC charge and termination was insufficient to establish retaliation); *Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1158 (7th Cir.1998) (holding that a three-month gap between employee's filing of EEOC charge and her discharge was insufficient to link filing of the charge to termination without other evidence).

Coleman attempts to overcome this hurdle by pointing out that Scruggs yelled at Coleman for discussing her discrimination case with co-workers on July 23, 2007, prompting Coleman to immediately depart for medical leave. (Pl. Ans. to Interr. ¶ 9.)[7] Presumably, this

---

[7] The County defends, yet cites no authority for, the proposition that interrogatories submitted in an untimely matter may not be considered in a motion for summary judgment. Such a penalty is unnecessary; Coleman's failure to timely answer the County's interrogatories has already been remedied by the Court's motion to compel. The Court

17

outburst exposed Scruggs' longstanding retaliatory motives, which went on to inspire the rejection of Coleman's restrictions upon her return from leave two months later. While such circumstantial evidence is proper, the suggested causal link to Coleman's initial charges is extremely tenuous. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) ("Under the direct method, a plaintiff may offer circumstantial evidence of intentional retaliation, including evidence of . . . behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn"). It is further compromised by the fact that, a year earlier, Scruggs had worked with the Chief Financial Officer to create a special position specifically tailored to Coleman's restrictions. (Remer App. ¶ 6.)

Nevertheless, viewing the evidence in the light most favorable to Coleman, the Court is unable to say that no reasonable juror could doubt that Scruggs acted without retaliatory motives, given the nature of her alleged outburst. As such, Coleman's retaliation claim survives, if just barely, this motion for summary judgment.

**III. Judicial Estoppel**

The County lastly argues that Coleman's claims are barred by the principle of judicial estoppel under *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 805-06 (1999). The County cites *Cleveland* for the proposition that a plaintiff who has received disability benefits is barred from later bringing claims under the ADA. *Cleveland* does not stand for that principle; the Supreme Court specifically held that the option remained open. *Id.* at 805. The Supreme Court merely required that, if a plaintiff had previously asserted total disability in an

---

also observes that Defendants have premised certain Rule 56.1 statements of facts on Plaintiff's answers; it would be inconsistent to apply the County's proposed rule to one party and not the other.

application for Social Security Disability Insurance, she must then provide the court with an explanation as to how she could also perform the essential functions of her job with reasonable accommodation if she wishes to defeat summary judgment on an ADA claim. *Id.* at 806-07. The petitioner in *Cleveland* explained that her prior assertions of total disability were made in a forum that did not consider the effect of reasonable workplace accommodations on her ability to work. *Id.* at 807. The Supreme Court accepted this explanation, reversed the decision to grant summary judgment, and remanded for further proceedings. *Id.*

Coleman collected disability benefits under the Illinois Pension Code, which defines a disability as an "incapacity as the result of which an employee is unable to perform the duties of her position." 40 ILCS 5/9-113. Like the petitioner in *Cleveland*, Coleman explains the discrepancy by pointing out that the Illinois Pension Code does not take into consideration whether an employee is able to perform the duties of her position with a reasonable accommodation. The County has not contested this explanation. Summary judgment under *Cleveland* is therefore unwarranted.

## CONCLUSION

For the foregoing reasons, the County's Motion for Summary Judgment on Coleman's claims under the Americans with Disabilities Act is GRANTED in part and DENIED in part. Summary judgment is GRANTED in favor of the County on any failure to accommodate claim arising from requests denied prior to July 8, 2004. Summary judgment is DENIED as to Coleman's retaliation claim and any claims related to requests for reasonable accommodation denied after July 8, 2004.

Enter:

/s/ David H. Coar

_____

David H. Coar
United States District Judge

Dated: **February 25, 2010**